Selden, J.
The most prominent question involved in this case, and that which I deem it expedient first to con sider, is whether the transaction between Schermerhom and his associates and the Trust Company was usurious. It will facilitate our inquiry and tend to give distinctness to the precise question which the case presents, to bring into view at the outset the most common forms under which the question of usury has arisen; and to notice some of the distinctions in regard to it which have been recognized and established by judicial decision. We shall thus separate this, case from some which it may seem to resemble, but from which it essentially differs.
To constitute usury there must be a loan of money or its • equivalent. (Dry Dock Bank v. Am. Life Ins. & Trust Co., 3 Comst., 361.) The common expedient resorted to, therefore, to evade the statute, is to give to the transaction the form of a sale, instead of a loan: a disguise which, whenever it can be discovered, is stripped off by the courts and the transaction declared usurious. Goods are frequently purchased upon a credit and immediately resold at a sacrifice *116 for cash for the purpose of raising money. To establish the allegation of usury in such a case, it is necessary to prove that the price agreed to be paid to the original vendor was more than the value of the goods; and, also, that a loan was intended under the form of a sale. These two facts must co-exist or there is no usury. It is obvious, therefore, that the price at which the goods are resold is of no importance except so far as it may bear upon the other questions involved. However great the sacrifice upon such resale, the transaction will not be usurious, unless the original vendor is by the contract to receive more than the actual market value of the goods. It is equally plain that however exorbitant the price agreed to be paid to such vendor, if he be ignorant of the purpose of the purchase, and the sale be not intended by him as a mere cover for a loan, there is no usury. So if one purchases of a bank the bills or notes of some other bank, which are depreciated in the market, and give his own notes for more than their market value, the same questions arise. Whether usurious or not depends upon tire question whether the transaction was in reality a sale or a loan, and this is to be gathered from the situation of the parties and all the facts and circumstances of the case. But suppose instead of the notes of another bank, he receives the notes of the bank to which he applies, and these are depreciated, but he nevertheless gives his own note for them at par, can any such question arise in that case? Gan usury be predicated of such a transaction ? Clearly not. Ho question as to the value of the notes can arise, as between the bank and the borrower; because, whatever may be the value of the notes in the market, the bank is bound to redeem them at par; and it cannot be said that the bank has made a profit by taking a note for precisely the same sum that it has obligated itself to pay. Frima facie, at least, such a transaction is a loan ; because, a bank cannot, make a sale of its own promises to pay; which are of no value so long as they remain in the *117 possession of the bank. It is not until they have passed into other hands that they acquire a value and become possessed of the attributes of property.
It would seem hardly to require either authority or argument to prove that a person cannot sell his own promises to pay. It necessarily results from the very definition of a sale, in which all writers agree. Chancellor Kent says: “ A sale is a contract for the transfer of property from one person to another for a valuable consideration.” (2 Kent's Com., 468, 5th ed.) Bouvier, in his Law Dictionary, defines a sale to be “ an agreement by which a man gives a thing for a price in current money.” He adds: “ To constitute a valid sale there must be a thing sold.” Long says: “ Three particulars are included in a valid sale, viz : a thing which is the subject of it, a price, and the consent of parties. If the subject of the intended sale have no exist- • ence, actually or potentially, there can be no valid sale.” (Long on Sales, 3.)
It is plain that the giving, of one’s own promise to pay to another, for any consideration, cannot be brought within these definitions of a sale. It is impossible to call such a transaction a transfer of property from one person to another, as the promise is not property in the hands of the promisor. One who executes and delivers such a note thereby makes a valid contract, viz., a contract to pay according to the tenor of the note. All that he does, i. e., both the execution and the delivery are essential to the completion of this contract; which certainly is not a contract of sale, but is supposed to be the subject of such contract. If then there is a sale, it is made by the same acts which create the thing sold. This is not only repugnant to every just definition of a sale, but logically absurd.
If then it be clear that neither individuals nor corporations can sell their mere promises to pay, the doctrine which has been deduced from the contrary assumption, viz., that upon an exchange of notes, the parties may put what relative *118 value they please upon their respective obligations, without affecting their validity, unless it is proved by extrinsic evidence that they intended the transaction as a mere cover .for usury, falls to the ground. The basis upon which that doctrine rests is, that such an exchange is prima facie a mutual sale of the notes; and that evidence is required to rebut this legal presumption.
The trae rule on this subject I hold to be this : that whenever the question of usury arises, no value can be put upon the promises or obligations of either party different from that which they import upon their face. This is universally conceded in respect to the obligations of the borrower. If a lender advances $90 in money, and takes a note for $100, with interest, he cannot defend himself against the charge of usury by showing that the responsibility of the borrower is doubtful, and that his notes would be worth less than par in the market. The question is to be determined upon the face of .the transaction. It is usury per se. Upon what principle, then, can one who instead of the $90 in money, gives • his note for $90, allege that the note he takes in return is worth less than its face? The only reason ever given is the one which has, I think, been refuted, viz., ' that the latter transaction is a sale, and not therefore within the statute. So, if the borrower choose to receive the promissory notes of the lender instead of money, he cannot, I think, upon the question of usury, take the ground that such notes are depreciated in the market. If he gives his own obligations for no greater nominal amount than that for which he. receives the obligations of the lender, there can be no usury. To constitute usury, the lender must take or receive, or contract to take or receive, more than the legal rate of interest; and such a project cannot be predicated upon the assumption that he will fail to redeem his own obligations.
It may be said that, admitting a mere exchange of obligations not to be a sale, neither is it a loan; and hence that it is entirely without the statute of usury, unless brought *119 within it by extrinsic evidence that an evasion of the statute was intended. It is trae that literally, the transaction is neither a sale nor a loan, but an exchange. I apprehend, however, that legally, in reference to the question of usury, it must be regarded as one or the other. No other distinction has ever been applied to such transactions by the courts. If, then, it is either, it clearly results from the principle already stated which estimates the respective obligations at their nominal value, that it resembles a loan far more than a sale. This estimate is entirely incompatible with the idea of a sale, but perfectly consistent with that of a loan. Such an exchange has been sometimes said to be a “loan of credit, and as such within the statute of usury. But the opinion of Judge Gardiner in The Dry Dock Bank v. The Am. Life Ins. Co. (3 Comst., 344), shows conclusively, 1. That credit cannot be loaned; and 2. That the statute of usury applies only to loans of money or its equivalent.
It may seem to follow from the course of reasoning here adopted that the transaction between Schermerhorn and his associates, and the Trust Company, should be treated upon the mere face of the contract, independent of all extrinsic evidence, as a loan, within the provisions of the statute. " It is, however, unnecessary so to hold. The supreme court has found that it was “in substance and effect a loan of money ” by the Trust Company, i. e., of its certificates of deposit or post notes, as a substitute for, and in lieu of money; a finding which I think fully warranted by the evidence; indeed I think it is not possible to come to any other conclusion.
The whole object of Schermerhorn and his associates was to raise money by way of loan, and this was well known to the officers and managers of the Trust Company. The bargain for the sale of the certificates to Mr. Biddle was made with the full knowledge of Mr. Duer, the vice-president of the Trust Company, before the certificates were issued No case, I apprehend, can be found of an exchange of obligation's under such circumstances, which has not been held to be a *120 loan; and if a loan at all, it must be a loan of money or its equivalent, as is shown by Judge Gardiner in his opinion before referred to. He says: “ Every transaction of the kind, when analyzed, will be found to be a loan of money, ■ whether disguised or not under the form of an exchange.” If extrinsic evidence is necessary where the parties have exchanged then personal obligations, to prove that a loan was intended, nothing more can in my view be required than to show that the object of one of the parties was to raise money, and that this was known to the other.
It being established then that the transactions between these parties was substantially a loan of money, i. e., of the certificates or post notes of the Trust Company received by the complainant and his associates as money, the next inquiry is, was it usurious 1 This question is to be determined in view of the principles already advanced. It follows from those principles, that the question of usury depends in no degree upon the price at which the certificates were sold by the complainant. However great the sacrifice upon such sale, no part of the profit made enured to the benefit of the Trust Company. Nor does it depend upon the value in the market of the certificates loaned. That question arises as we have already seen, only when a loan is made under cover of a sale. The transaction here was clearly not a sale. But it depends entirely upon the relative amount of the securities exchanged, estimated at their face respectively; and in making this estimate any difference in the interest has the same effect as a difference in the principal. The position assumed by Welles, J., on this subject in The Farmers’ Loan and Trust Co. v. Carroll (5 Barb., S. C. R., 616), is, I think, sound. He says: “I hold it to be law, that in all cases of a loan, where it appears upon the face of the transaction that the lender is, in any manner, to receive inore than the legal rate of interest as a compensation for forbearance upon the thing loaned, it is usury yer se.” This is said in reference to the precise case presented here. The certificates loaned to Carroll ran *121 twenty years, and bore interest at five per cent, while Carroll was to pay interest to the company at the rate of seven per cent.
Any difference in the nominal amount of the securities exchanged has been repeatedly held in England to constitute usury per se. (Matthews v. Griffiths, Peake's N. P. Cases, 200; Maddock v. Hammet 1 Bos. & Pul., 154; Parr v. Eliason, 1 East. 92.) It makes no difference whether the discrepancy is in the principal or the interest. If it appears that, at the end of all the payments, the lender will have received more than his principal with lawful interest, the contract is usurious.
The rule which has been applied in England to grants of annuities for years, in consideration of a certain sum received, is strongly analogous in principle to that contended for here, and rests upon a similar foundation. Such an annuity is simply an agreement to pay a specific sum in instalments, and is not a sale for the same reason that the giving of a promissory note is not a sale. It has accordingly been frequently held, that in such a case the qestion of usury depends upon computation merely. In the case of Doe v. Gooch, (3 Barn. & Ald., 664); Bailey, J., in reply to' the counsel who 'had referred to the case of an annunity for life, said: “ In that case the principal is in hazard from the uncertain duration of life. Here it is in the nature of an annuity for years, and there is no case in which an annuity for years has been held not to be usurious, where on calculation it appeared that more than the principal together with legal interest is to be received.” In Fereday v. Wightwick also (Russ. & Myl., 45), where an annuity of ¿£664.18 had been granted for the term of eleven years and a half, in consideration of the sum of ¿£4000 received, the master of the rolls said : “ This in effect is an agreement to repay the principal sum of ¿£4000, with interest, in twenty-three instalments, and as it appears that the interest thus paid will exceed legal interest, the trans *122 action is plainly usurious.” In this case an annuity for years is placed upon the same footing as any other contract to pay a certain number of instalments; and the principle asserted is, that whenever it appears on the face of the transaction that at the close of all the payments more than the sum advanced, with legal interest thereon, will have been returned, the contract is usurious. Although such a transaction is called the purchase of an annuity, yet no evidence is required to show that it is intended as a- cover for a loan; because the annuity being simply an engagement by the party himself to pay a certain number of instalments, it is impossible that it should be, in the eye of the law, a sale. The question was again presented in the case of Ferguson v. Sprang (1 Ad. & El., 576), where in consideration of ¿£200 received, an annuity of ¿£20 had been granted for sixty years. Lord Denman seemed to think that a question arose as to the value of the annuity, independent of its nominal amount; and that if the jury should find, “ looking to the value of the annuity granted, that the transaction was a Iona fide contract for an annuity,” it might stand ; but the other three judges all agreed that it was a mere matter of calculation, and that it should be submitted to a jury simply to “ calculate the excess.” The same doctrine was reiterated by the vice-chancellor in the case of Chillingworth v. Chillingworth (8 Simons, 494), in which the case of Ferguson v. Sprang was reviewed.
I consider these cases as resting upon a firm basis of principle, and as tending to establish the doctrine contended for here; that whenever the question of usury arises between the parties to any transaction, the obligations of the parties themselves cannot be estimated otherwise than at their nominal amount; and that consequently, upon every exchange of notes or other obligations, the question of usury becomes one of mere computation.
Assuming this doctrine to be correct, it is unnecessary to go into anv minute examination of facts or calculation of ° o *123 amounts; for if the certificates be estimated at the full commercial value of the pound sterling, and to this the Trust Company is clearly entitled, including the usual rate of exchange between New-York and London on all funds which it will be necessary to remit to meet them, there w’ould still be a very considerable difference, as is shown by the proof, between the amount of the certificates and that of the bonds taken in exchange for them, growing out of the difference of two per cent in the rate of interest; and there can be no risk in inferring that this difference constituted the inducement on the part of the Trust Company to enter into the arrangement. I deem the conclusion inevitable, therefore, that the transaction was usurious. It follows that the complainant is entitled to some, portion at least of the relief which he asks; unless he is jrrecluded upon the grounds assumed on the part of the appellants.
It is urged by the appellants’ counsel, that it appears from the bill itself that the complainant was a participator in violating the banking laws of the state; and that while the facts alleged might constitute a good defence, were the Trust Company seeking to enforce the payment of his bond, the court will not grant affirmative relief to one who shows himself to have been concerned in an illegal transaction.
There is no rule better established than that wdrich refuses the active interposition of a court of equity in favor of one who is particcps criminis; but like most other rules it admits of exceptions. There are certain cases where the party seeking relief, although particcps criminis, is not in pari delicto, to which it does not apply. This distinction seems to have been first taken by Lord Mansfield, in the case of Smith v. Bromley (2 Doug., 696, note to Jones v. Barkley). The exception was there applied only to cases where the law violated was intended to protect one of the parties from particular acts of oppression or extortion by the other; as for instance the statute against usury. Subsequent cases however, show that the principle is not *124 confined to that class of cases. The next case in which the question arose, was that of Jacques v. Golightly (2 Win. Bl., 1073). The plaintiff had paid to the defendant money as a premium for insuring lottery tickets, a transaction prohibited by statute, and the action was brought to recover it back. It was insisted for the defendant, that the plaintiff being particeps criminis, could not recover. But the action was sustained. Blackstone, J., said it was not like the stockjobbing act; “ because there both parties are made criminal, and subject to penalties.'' Browning v. Morris ( Cowp., 790), was another case of the same kind. Lord Mansfield there draws the distinction between acts which are mala in se, such as bribery, and those which are merely prohibited by statute; and in the course of his opinion remarks that, “ it is very material that the statute itself by the distinction it makes has marked the criminal; for the penalties are all on one side; upon the office keeper.” A similar question afterwards arose in the case of Williams v. Medley (8 East, 378), where it was very elaborately examined by Lord Ellenborough, who confirmed the doctrine of the previous cases. The principle of these cases is so obviously just, that no argument seems necessary to sustain it. To say that in every transaction prohibited by positive enactment, the parties concerned are necessarily in pari delicto, would in many cases be manifestly absurd ; and the test adopted by Lord Mansfield and Mr. Justice Blackstone, by which to determine the relative guilt of the parties, viz., to see' upon which party the penalty is imposed, would seem to be just. .
These cases have been several times reviewed and approved by the supreme court of Massachusetts. In the case of Inhabitants of Worcester v. Eaton (11 Mass. R., 368), Ch. J. Parker after referring to the cases of Smith v. Bromley and Browning v. Morris, supra, says: “ This distinction seems to have ever been afterwards observed in the English courts, and being founded in sound principle, is worthy of *125 adoption as a principle of common law in this country.” The same question afterwards arose in the same court, in White v. The Franklin Bank (22 Pick., 181), and was there very fully discussed. The suit was brought to recover money which the plaintiff had deposited with the defendant, under an agreement that it should remain for a certain specific time, in violation of an express statutory provision, which prohibited the bank from making contracts “ for the payment of money at a future day certain.” The action was held to lie, and the principle of the English cases to which I have referred was emphatically sustained by the unanimous opinion of the court. (Lowell v. Boston & Lowell R. R. Co., 23 Pick., 24; Atlas Bank v. Nahant Bank, 3 Met., 581.)
It was said upon the argument, that the modern cases are opposed to this doctrine ; but I am very firmly persuaded that the doctrine is sound and the distinction upon which it rests one which exists in principle and in reason. It applies no less in equity than at law, its foundation being that the parties, although joint participators in an illegal transaction, are not equally criminal. ' In the present case the penalty for violating the statute is imposed upon the Trust Company alone.
It is unnecessary, however, to decide what would be the rights of the complainant were he seeking some kind of relief on the ground of a violation by the Trust Company of the restraining law. The question is, whether he is precluded from all relief against the usury, because the usurious contract was connected with a transaction which was within the prohibition of the restraining act. I see no just ground for thus holding. The usury and the violation of the restraining law are entirely distinct offences. The statutes are distinct and the penalties distinct. The one offence depends upon circumstances having no necessary connection with those which establish the other. The complainant in the eye of the law is one whom the statute of *126 usury was designed especially to protect; and why should he be deprived of this protection because, in connection with the usury, there was another violation of law ? If instead of an act entirely innocent in itself, and only wrong because prohibited on grounds of public policy, the complainant had participated in the commission of an offence malum in se, involving deep moral turpitude, there might seem to be a moral if not legal propriety in depriving him of the remedies which the law affords by way of penalty for his crime. The case of usury being an admitted exception upon principle to the rule which denies relief to onq who is particeps criminis, I do not see how it is brought within that rule by being connected with another offence involving on the part of the complainant, at least, no greater degree of moral guilt. No authority other than those which establish the general rule was cited for the position, and I think none can be found to sustain it. This rule, therefore, affords in my view no obstacle to the relief sought by the bill.
To what relief then is the complainant entitled ? This depends in some measure upon the question whether he is to be regarded as a borrower within the provision of § 4 of the act of 1837, which provides, “ that any borrower of money, goods .or things in action,” may file a bill for relief against usury, without offering to pay any part of the sum loaned; and that the payment of the whole or any part of such sum shall not be required as a condition of granting. the relief. If Schermerhorn, under the proof in the case, is not entitled to relief as a borrower within the meaning oi this provision, then, according to the settled principles of equity, he must “ do equity” before the court will interpose in his behalf. The supreme court held that Schermerhorn was to be regarded as a borrower notwithstanding the bankruptcy, on the ground that the word borrower in the statute is intended as descriptio persones, and that the complainant comes within that description. Judge Marvin, who delivered the opinion of the court, on this subject, says *127 “The plaintiff is certainly within the letter of the statute.” It describes him. He was the “ borrower.” This is no doubt true. But is it not necessary, in order to give him the benefit of the provision, that he should be entitled to relief, in his character of borrower? Is not the true question, whether he comes into court as the borrower, whether he represents the title and interest which the statute wras designed to protect, and whether, if relieved at all, he is to be relieved as the borrower, or as the purchaser at the sale in bankruptcy ?
In the cases of Post v. The Bank of Utica (7 Hill, 391) and Rexford v. Widger (2 Comst., 131), it was held, that the term borrower did not include purchasers from the borrower. What is the complainant here but a purchaser? It is said that he had never parted with his entire interest; that he would have been entitled to an account from the assignee ; and that if his debts had been discharged without a resort to this property, it would have revested in him. But the answer is, that by the sale, every vestige of his original interest was cut off. He acquired by the purchase the same rights that would have been acquired by a stranger, and none other. It is by virtue of the title acquired, at the sale alone, that he comes into court, and the circumstance that he is the same person who was once entitled to relief as a borrower is a mere accident, which cannot affect his rights. He can claim the same relief to which the assignee in bankruptcy, or any other purchaser under him, would be entitled. If he asks equity, therefore, he must do what equity requires.
But it is insisted on the part of the complainant, that the post notes issued by the Trust Company are void ; that the company is not liable for their payment; and hence, that equity does not require any provisions to be inserted in the j udgment for its benefit or protection. Whether these notes are void or not is a question between the Trust Company and the holders. It has never yet been decided in this state, *128 so far as I am aware, that a hanking company can set up its own violations of law as a defence against its negotiable promissory notes, in the hands of a bona fide holder for value; and that decision will hardly be made for the first time, upon a collateral presentation of the question, in a case to which the holders of the notes are not parties.
What then does equity require in this case? Plainly, that the bond of Schermerhorn should be canceled, and that he should be put in possession of the property purchased of the Holland Land Company, and its proceeds, upon payment of the sum actually borrowed of the Trust Company, with interest to this time. In ascertaining that sum, we are not to be governed either by the amount which the complainant and his associates received for the certificates, or by their market value at the time of the loan, but exclusively by the amount of the obligation which the Trust Company assumed upon the face of the certificates ; in other words, the amount which the company must pay to redeem them. The relief granted to Schermerhorn, therefore, should be upon condition that he pay the principal sum loaned, estimating the pound sterling at its value in London where the certificates are payable, and interest upon that sum to the time of payment; with a rebate, however, of the difference in interest of two per cent for the whole time the certificates have from their dates to run.
It was insisted orally upon the argument, that the effect of declaring the contract between the complainant and his associates and the Trust Company usurious would be to, render void not only the bond of the complainant, but every other part of the transaction, including the deed of the Holland Land Company to the trustees; thus leaving the title to the land, and other property in question in the last mentioned company. But Chancellor Walworth in his printed argument concedes that this consequence would not necessarily follow unless relief is granted to the conn plainant as a borrower under the act of 1837. He say : *129 “ The case is different where the complainant comes into court to do equity. By making such an offer he waives the forfeiture; and the court in such a case instead of setting aside the transaction is authorized to confirm it, so far as is necessary to do equity between the parties; and to mould and regulate the interests of all parties therein, so as to do perfect equity. In such a case the court confirms such parts of the transaction as ought to be confirmed, and sets aside or corrects such parts thereof as ought to be corrected.”
This is a clear and accurate statement of the rule, except that the power of the court so to arrange the different parts of the entire transaction as to accomplish what equity demands, is not confined, I apprehend, to cases where the complainant offers in his bill to do equity, but exists in every case in which the court is called upon to adjust the rights of the respective parties upon purely equitable principles. Formerly when bills of this character were filed to obtain a discovery as well as relief, unless the complainant offered in his bill to do what equity would require, upon the facts alleged in the bill itself, the defendant might demur ; not because the court could not, if the facts were esstablished, grant the relief to which the complainant was equitably entitled, but because a discovery would not be compelled without such offer. If, however, the defendant voluntarily answered instead of demurring, and the allegations in the bill were proved, the books are full of cases in which relief was granted upon such terms as to the court seemed just. (Livingston v. Harris, 3 Paige, 528; Fanning v. Dunham,, 5 John. Ch. R., 122.)
In this case, there can be no difficulty in adjusting the • equities of the parties, because no part of the transaction need be avoided except the bond of Schermerhorn. The deed of the Holland Land Company and the partition among the associates should be confirmed; and the trust in favor *130 of the Trust Company should be permitted to stand until the actual indebtedness of Schermerhorn to the company is paid.
It should be referred to a referee to compute the amount due to the Trust Company upon the principles here indicated, and to take and state an account between the trustees, the Trust Company, and the complainant, mutually and respectively ; and the judgment should provide that the complainant pay the balance, if any, which may be found due to the Trust Company, with interest; that the proceeds of the trust property continue to be applied to the payment of such balance until the same shall be fully paid; and that upon payment thereof in full, either by the complainant or by the trastees from the proceeds of the trust property, the complainant shall be entitled to a conveyance and assignment from the trustees of all the trust property remaining in their hands or under their control, or in the hands or under the control of their agent or agents. The judgment of the supreme court must be modified accordingly, and the proceedings must be remitted to that court with instructions to carry out the principles herein set forth. No costs are to be allowed to either party in this or in the supreme court.
Denio, C. J.
The claimant based his claim for relief in the supreme court upon several grounds: First. That the arrangement of 11th July, 1838, was infected with usury; Second. That it was void for want of power in the American Life Insurance and 'Trust Company, under its charter, to issue the certificates of deposit mentioned in the pleadings and proofs; and Lastly. That the issuing of these certificates was, under the circumstances, a violation of the laws of this state relating to unauthorized banking. That court pronounced the judgment appealed from, on the assumption that the arrangement referred to was usurious, and that the plaintiff could be relieved against it in this action though he had not paid or offered to pay the sum really owing, without examining the other questions. It *131 will, therefore, be convenient to examine the case in reference to the alleged usury in the first instance.
It was well settled; prior to the enactment of the Revised Statutes, that a party, seeking in a court of equity to set aside a contract or conveyance on the ground of usury, was bound to pay or at least offer to pay the creditor the amount owing him, deducting the usurious premium. This was upon the ground that the principles of the court did not allow it to lend its aid to enforce a penalty or forfeiture—its jurisdiction being to relieve against such claims upon equitable'considerations. A provision in the Revised Statutes dispensed with this condition, in favor of the borrower, where relief only without a discovery was sought. The usury act of 1837 went further, and provided that “ whenever any borrower of money, goods or things in action, shall file a bill in chancery for relief or discovery, or both, against any violation of [the Revised Statutes respecting usury, or] this act, it shall not be necessary for him to pay or offer to pay any interest or principal on the sum or thing loaned; nor shall any court of chancery require or compel the payment or deposit of the principal sum or interest, ór any portion thereof, as a condition of granting relief or compelling a discovery to the borrower in any case of usurious loans forbidden by said title or by this act.” (Laws of 1837, 487, $ 4.) The question immediately arose, whether the dispensation thus provided for was limited to suits prosecuted literally by the borrower, or whether that term was used in a general sense to denote the party claiming to be aggrieved by the alleged usury; whether he was the original party to the loan or one representing him by privity of estate. The limited construction was finally adopted by the courts; and that construction has been established by the tribunal of last resort. (Post v. The President, &c., of The Bank of Utica, 7 Hill, 391; Rexford v. Widger, 3 Barb. Ch. R., 640; S. C., 2 Comst., 131.) If, therefore, Mr. Schermerhorn had sold his interest in the *132 lands in question to another, or, if his assignee in bankruptcy had disposed of his interest in them to any other person than Schermerhorn himself, the purchaser in either case could not have had relief except upon the condition of paying the sum really due, with legal interest. But the assignee in bankruptcy sold the estate in question to Schermerhorn, who was the borrower upon usury if there was an usurious loan; and hence it is argued by the counsel for the respondents, that as he answers the description of the party whom the act intended to favor, he is entitled to the benefit of the dispensation provided for such party. Under the same proceedings in bankruptcy Schermerhorn. received a certificate and discharge from his debts, so that, although he was once a borrower, he is not now personally chargeable in consequence of such a relation. He sustains, moreover, the same relative situation towards the property that any other purchaser under him would have done. So far as there is any substantial distinction between the situation of a person who has mortgaged, his own property for the payment of a loan, and one who has become the owner of such property by a conveyance from another mortgagor—Schermerhorn occupies the 1 after position. His title to the property is not at all affected (unless it be in the particular under consideration) by the fact that he was once before the owner of the same property. He is no way burthened with the debt which he seeks to avoid, except that if it constitutes a valid incumbrance upon the land, it impairs the value of his interest in it to the same extent, and in the same manner, in which it would have operated against any other purchaser under him. We are bound to assume, that the discrimination which the statute has made between the party to the loan and one who has purchased the property incumbered by a former owner, was based upon some substantial reason. It is the theory of the laws against usury that the borrower is under a species of moral ■ duress, and hence his consent and cooperation in the illegal *133 transaction does not prejudice him. But one about to purchase property incumbered by an usurious lien is under no such coercion, but is as free to abstain from the purchase as to avoid entering into any other transaction. The defence of usury is not, however, personal to the borrower. As all contracts and conveyances infected with that vice are absolutely void, any person holding property apparently incumbered with such contracts and conveyances made by his predecessor in the title, may show the fact, upon which the law adjudges that the property is unaffected. When, however, the legislature came to provide new and increased facilities for establishing an allegation of usury, the remedy was given to the victim of the usury alone, to the exclusion of parties holding derivative titles under him. It may be safely affirmed that the motive for the discrimination was the supposed meritorious character of the former, as compared with the latter. The new remedy was extended to a party whose person and estate, or both, vrere burthened with an obligation which he had been coerced to create; and it was denied to all other parties, I hough according to the antecedent laws they were entitled to avoid liens upon their property by complying with the conditions which such laws imposed. The position occupied by Schermerhorn when he filed this bill was not the one contemplated by the legislature. Though he had been a borrower, he had divested himself in a manner authorized by law of all the consequences of that condition. His present relation to the property and to the litigation which was commenced by the bill was that of a volunteer purchaser of the subject of the litigation. His prior connection with the subject was altogether immaterial. His right would have been precisely the same if some other person had been the party to the arrangement of the 11th July, 1838, and if such person had become bankrupt, and the property had passed into the hands of the assignee, and Schermerhorn had purchased at the sale. Quoad the *134 debt, the property and the incumbrance, as they existed when the bill was filed, Schermerhorn was not a borrower, but a purchaser. In my judgment it would be as reasonable for one who was a borrower of the party, sued by a collateral contract not connected with the loan sought to be avoided, to claim the benefit of the statute, on the ground that he was literally a borrower, as for Schermerhorn, under the circumstances of this case to claim it. It may be said that he is within the letter of the act; but he is not at all within its spirit or intention. Qiii hceret in litera hceret in cortice.
This view of the case was sought to be avoided by the complainant’s counsel by the allegation that the proceedings in bankruptcy were coram non judice and void, because the petition in bankruptcy was not, as it was said, sworn to before an officer authorized by the laws of the United States to take affidavits; and I have been unable to find any act of congress authorizing clerks of courts to administer oaths out of court. As to oaths taken in court, it is well known that they are usually administered' by the clerk or his deputy. The first order in the bankrupt proceeding which directs the publication of notice to show cause, and the order or decree of bankruptcy, both recite that the petition was duly verified. These orders were granted at the instance of the petitioner, and are some evidence against Mm that the verification was in all respects according to law. The deed to Schermerhorn recites the decree of bankruptcy, and the order appointing the assignee; and the defendants gave in evidence, in addition to the deed, certified copies of these orders. The fifteenth section of the bankrupt act provides “ that such recital [in a deed executed by the assignee], together with a certified copy of such order, shall be full and complete evidence both of the bankruptcy and assignment therein recited.” The defendants also gave in evidence the discharge of Schermerhorn from Ms debts. The fourth section of the act declares that *135 the certificate and discharge, when duly granted, shall be conclusive evidence in itself in favor of the bankrupt. I am of opinion, however, that any party may show that the district court did not obtain jurisdiction to make these orders; and that affirmative proof that the petition was not legally sworn to would be fatal to the proceedings. (Seaman v. Stoughton, 3 Barb. Ch., 344; Ruckman v. Cowell, 1 Comst., 505, per Bronson, J.) The oily question then is, whether the jurats attached to the petition and schedules afford sufficient evidence to overcome the presumption afforded by the deed and the several orders above mentioned. The language of the jurats, it must be admitted, is more appropriate to set forth an oath taken before a clerk alone than to a statement that the oath was taken in court. They do not, however, state positively that the oath was not taken in court. Knowing as we do that the clerk had no authority to administer an oath out of court, but that his power to administer one as the immediate officer of the court and in its presence was ample; that this oath was administered on the same day that the petition was presented, and that the court is declared to be always open, and applying the principle—ut res magis ualeai quam per eat—to this case, X am inclined to the opinion that it should be held that the papers were duly verified.
I will in the next place state briefly the conclusions of my mind upon the question of usury : First, the value of a pound sterling was not over estimated when it was received as equivalent to $4.71; but assuming that exchange was at par it was undervalued by about sixteen cents. An act of congress, passed in the year 1834 (4 U. S. Statutes at Large, 700), fixed the value of foreign, and among others of British gold coins, in federal money, by reference to the fineness of the gold and the weight. According to this authentic stan dard, which was in force when the transaction in question took place, the British sovereign, which is a coin representing a pound sterling is equivalent to about four dollars and eighty- *136 seven cents. (Treatise on Banking by J. W. Gilbert, General Manager of the London and Westminster Bank, 5 Heman’s Banking Magazine, 902; 1 Hunt's Merch. Mag., 535, 6; 34 id., 345.) The difficulty which embarrassed the supreme court arose out of the early practice of considering a Spanish silver dollar the equivalent of four shillings and sixpence sterling, and the act of congress of 1799 respecting the collection of duties on imports and tonnage, by which the pound sterling of Great Britain was required to be reckoned in the calculation of ad valorem duties on imports at $4.44. (1 Story's Laws U. S., 226, 861.) The subject was further complicated, by calling the difference between the standard thus adopted and the real value of the pound sterling at any given time in our money, as a premium of exchange. Thus, when exchange on England is said to be 9-ff per cent, above par, it is really at par, for the addition of that amount per cent to $4.44 will produce the sum which precisely represents the value of the sovereign.. If exchange rises still higher, it indicates that the balance of trade is against this country, and if the difference is sufficient to pay the expenses of exporting the precious metals, gold will be sent to England in preference to bills of exchange purchased aj; the current rate. If this was the only difficulty in the arrangement of July 11, 1838, it would cause no embarrassment. Second. But the certificates of deposit which Mr. Schermerhorn and his associates received bore an interest of only five per cent per annum, while they secured to the company an amount of money intended to be equivalent to the sum of English money represented- by the aggregate of the certificates of deposit, with seven per cent interest. Then the certificates had twenty years to run, and assuming, as we must do, upon a question of usury, that our legal rate of interest represents the true value of the use of money, the associates would sacrifice the amount of the two per cent per annum, upon the whole sum of the certificates for each of the ensuing twenty years. When the transaction :s really *137 a loan, and the borrower receives some security or promise to pay money instead of the money itself, the first question is whether the paper received calls for a sum equal to the amount which the borrower engages to pay. There is no difference in principle between a case where the security advanced by the lender is for a less nominal amount than the borrower’s undertaking for repayment, and this case, where the difference is produced by an adjustment of the rate of interest. If one upon a negotiation for a loan gives his note for $1000 for the lender’s note, upon which to raise money, for $800, the transaction is confessedly usurious ; and it is not less so if the principal named in the security is equal, but the difference in the amount ultimately payable is produced by the insertion of different rates of interest in the two securities. It is upon this principle that the advance of post notes by the lender, the borrower undertaking to pay the same amount with legal interest, is usurious. (Dry Dock Bank v. The Amer. Ins. Co., 3 Comst., 361; N. Y. Life Ins. Co. v. Beebe, 3 Seld., 364.) There is, however, a principle upon which, in the case last supposed, the loan would be free from usury. If the paper advanced by the lender instead of money, has a fixed market value, it may, I think, be safely loaned at such value, though the money secured by it may be mathematically less than that'which the lender agrees to pay. Such is the case with public stocks. They may be, and frequently . are, worth more than par, though the interest which they bear is lower than the current rate of interest upon other securities, or than the legal rate. A holder of such stocks may legally advance them to a borrower upon the negotiation of a loan, at their market value, and take his obligation payable on time with legal interest; and so, I doubt not, an. individual or corporation thus fortunately situated as to credit, may issue its own paper and receive security therefor payable on túne for the market value of the paper thus issued. So in the case of an application bona fide made for *138 securities, payable at a future day for remittance or other lawful use, the transaction would not be objectionable though the arithmetical value of the paper thus purchased should be less than the obligation given to secure the payment, even if the last mentioned securities had no market value. In such case the object would not be to effect a loan, but to purchase exchange or the like. But in the absence of any such artificial or market value, and where the transaction is really a loan, and the borrower has bound himself to pay more money than the securities which he has received from the lender will oblige the latter to pay, the difference is an usurious premium. Without going over the evidence in this case, which, however, has been carefully examined, I am quite satisfied that the transaction between the associates and the Life and Trust Company was a loan by the latter to the former. The associates wanted money or something which would immediately produce money. They did not desire to purchase exchange or to procure an investment. The company had not indeed any ready money to loan, but they had credit, w'hich enabled money to be raised on their engagements, and they consented to issue such engagements, upon being secured, by means of the difference of interest, considerably more than the amount which these engagements would require them to pay. Their credit, however, was not só good as that their paper of this description would command a premium in the market. On the contrary, it was considerably below par. They could not, therefore, loan such paper for more than its real value, and that value must be measured, as has been already stated, by the amount of money which it would oblige them to pay. I am, therefore, of opinion that the transaction of July, 1838, was void for usury; and if Schermerhorn could be considered as a borrower he would be entitled to relief against the securities executed to effect that arrangement, without the performance of any condition.
*139 At the time the arrangement in question was consummated, the defendants’ charter was embraced in the act of the general assembly of Maryland passed in. December, 1837. The sixth section contains a limitation of the powers of the, company, in these words : “ This act shall not be construed to authorize the said company to issue for circulation as money, any of its own promissory notes, or notes in the nature of bank-notes, or certificates of deposit payable to bearer.” The certificates issued in 1838, though not in terms payable to bearer, were such in effect. They were payable to the order of Mr. Thurston, an officer of the'eompany, and endorsed by him in blank, so that they would pass by delivery. But it cannot be said that they were issued for circulation as money. The large amount of each certificate, the distant day at which they were payable, the fact that they bore interest and were payable in foreign money and in a foreign country, would entirely prevent them filling the place of currency. They resembled in their maim features, so far as this question is concerned public stocks more closely than circulating notes. They wmuld, doubtless, answer some of the purposes of money, and so would state stocks or any other good bonds or secu rities, but they are quite destitute of the qualities which would fit them for circulation in the manner which money circulates. They were not, therefore, forbidden by the act of incorporation. The prohibition in the 4th section of the original act of incorporation, passed in 1833, was broader, and prohibited the company from issuing and putting in circulation any negotiable note. ¿£12,000 of the certificates, which were eventually secured by the arrangement of 1838, were issued while the last mentioned act was in force. The issuing of them was a violation of the charter of the company. That charter however was not matter of municipal law with us. Its only effect was to regulate and define the power of the corporation, and when the company executed an act for *140 bidden by it, the result of the transaction in the view of the courts of this state would be that the act was without authority. When, however, this particular restriction was repealed by the new charter of December, 1837, it was competent for the parties who had received the benefit of the unauthorized certificates, to secure the company the amount agreed to be paid for them. These considerations have led me to the conclusion that the transaction in question is not invalid on account of the alleged violation of the charter of the company.
The 6th section of the title of the Revised Statutes relative to “ unauthorized banking and the circulation of certain notes and evidences of debt issued by banks,” declares that “no person or association of persons or body corporate, except such bodies corporate as are expressly authorized by law, shall keep any office for the purpose of receiving deposits or discounting notes or bills, or issuing any evidences of debt to he loaned or put in circulation as money; nor shall' they issue any bills or.promissory notes or other evidences of debt as private bankers for the purpose of loaning them or putting them in circulation as money unless thereto specially authorized by law.” (1 R. S., 712.) This provision was modified by an act of 1837 (ch. 20), as to the business of receiving deposits and discounting bills, but the' change did not affect foreign corporations. I am of opinion that the evidence establishes the position that all these certificates were issued for the purpose of being loaned as money by the corporation. It is not necessary that they should have been capable of circulating as money; it is" enough to constitute an offence against the statutes that they should be issued to be loaned. The evidence of Mr. Seward shows that this was the object for which they were made and delivered, and the general scope of the arrangement corroborates this position. The bargain therefore in all its parts was a violation of the laws of this state. The executory- stipulations .of the several parties were conse *141 quently void, and neither of them could maintain an action against any other party to compel a compliance with these stipulations.
It does not, however, follow, that any of the parties can sustain a suit in equity to rescind the arrangement or to set aside any of the deeds by which it was consummated. The parties were all participants in the transaction, and each is deemed to have consented to all the stipulations contained in the papers. It is manifestly impossible to discriminate in favor of those who were less actively engaged than the others. Those who took the more active part in the arrangement acted as the agents of the other parties, and notice to them is imputable to all the associates. It is an established principle of law that the courts will not entertain a suit to enforce an executory contract made in contravention of a statute of the state. If such a contract has been executed, an action will not lie in disaffirmance of it. In this class of cases the law will not extend its aid to either of the parties. It will not listen to their complaints against each other, but will leave them where their own acts have placed them. (Yates v. Foot, 12 John., 1; Nellis v. Clark, 20 Wend., 27; S. C. in Error, 4 Hill, 424; Staples v. Gould, 5 Sandf. S. C. R., 411; S. C. in Court of Appeals, April Tr., 1854; Talmadge v. Pell, 3 Seld., 328.) In this case Schermerhorn caused the title to the land in controversy to be conveyed to trustees for the benefit of the Life and Trust Company. That was an executed conveyance. If valid it operated, in connection with the papers constituting the defeasance, by way of mortgage, and vested a defeasable title in the trustees. The plaintiff seeks to dis-affirm and rescind this conveyance and have the premises conveyed to him on the ground that it was part of a transaction entered into in violation of a statute of this state. The principle of law referred to is fatal to the suit in this aspect of it.
*142 If the plaintiff was in a situation ,to avail himself of the act of 1837, respecting usury, I am of opinion that he would not be precluded from his remedy in that view of the case, by the consideration that the certificates were also a violation of the restraining act. The 5th section of the act of 1837, positively directs that where usury is shown, the usurious securities shall be set aside. It is not an answer to a prayer for relief under this provision that the particular transaction is illegal in-other respects. It is said, that to sustain the judgment of the supreme court, we must go further than we are required by the terms of the section referred to. In my opinion, the statute should be construed more liberally or rather more reasonably than this objection assumes. Its object was effectually to relieve the party who had given usurious securities. To do this in the case before us, we must require the trustees to convey to the plaintiff the land which he has pledged for an usurious loan. The original proprietors have been paid the consideration money of the purchase, and nothing stands in the way of the plaintiff’s enjoyment of the subject purchased, except the usurious arrangement by which that subject has been mortgaged to the Life and Trust Company. As to usury, the statute has abrogated the equitable maxim that the plaintiff, to entitle himself to relief, must do equity. He can now claim relief in cases within the act, without conforming to that maxim, and-in such cases he' should have the same full and ample remedy which he would have been entitled to if he had paid the real debt with legal interest.
If the plaintiff should be confined strictly to the case made by the complaint, the result of those views would be that the suit should be dismissed with costs, for the reason •that no offer to pay anything is made by the plaintiff, and that he is not entitled to the benefit of the act of 1837. But, a majority of the court, while concurring substantially in the foregoing positions, are yet of the opinion that relief *143 may and should be granted to the plaintiff on condition of payment of the sum equitably due to the Life and Trust Company, or its assignees ; and, in looking into the books, I find that courts of equity have been accustomed to grant relief in such cases upon equitable terms, though the bill contained no offer to pay the principal and legal interest. (Fanning v. Dunham, 5 J. C. R., 122, 144, 146, and cases cited.) I concur, therefore, in that disposition of the case. The value of the certificates of deposit which were issued for the use of Schermerhorn must be ascertained by reference or otherwise, and, upon payment of that amount, the unsold land belonging to the complainant must be conveyed to the present plaintiffs. Should they neglect to make such payment within a period- to be fixed by the decree, the complaint should be dismissed with costs. As the plaintiff did not intimate a willingness to submit to equitable terms until the argument of the appeal, he ought not to recover the costs of the litigation. The judgment will be settled before Judge Selden.
All the judges except Mitchell, J., who was of opinion that the transaction was not usurious, and Comstock, J., who took no part in the decision, concurred in the result of the foregoing opinions.
Judgment accordingly.